# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>YOUFIT HEALTH CLUBS, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-12841 (MFW)<br><br>(Jointly Administered)<br><br>**Ref. Docket No. 17** |

**OMNIBUS RESPONSE OF BGC LENDER REP LLC ON BEHALF OF THE PREPETITION SECURED PARTIES AND DIP LENDERS AND YF FC ACQUISITION LLC'S TO THE OBJECTIONS OF (A) JASON BLANK, INDIVIDUALLY AND ON BEHALF OF SIMILARLY SITUATED CLASS MEMBERS, (B) RICK BERKS, CHRISTY BERKS-STROSS, AND JASON STROSS, (C) CERTAIN LANDLORDS, AND (D) THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, TO THE DEBTORS' MOTION FOR AN ORDER APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND JOINDER IN THE DEBTORS' REPLY TO THE SAME**

BGC Lender Rep, LLC, on behalf of the Prepetition Secured Parties and DIP Lenders (as defined in the Final DIP Order) ("BGC") and YF FC Acquisition LLC (the "Buyer") respectfully submit this omnibus response to: (i) the *Preliminary Objection of Jason Blank, Individually and on Behalf of Similarly Situated Class Members, to the Sale Motion* [Docket No. 513] (the "Blank Objection"); (ii) the *Limited Objection of Rick Berks, Christy Berks-Stross, and Jason Stross to Proposed Sale of Substantially All of the Debtors' Assets and Proposed Assumption and Assignment of Executory Contracts* [Docket No. 515] (the "Berks Objection"); and (iii) the adequate assurance objections filed by certain landlords (the "Adequate Assurance Objections"); and, together with the Blank Objection, the Berks Objection, and the Adequate Assurance

---

[1] The last four digits of YouFit Health Clubs, LLC's tax identification number are 6607. Due to the large number of debtor entities in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the claims and noticing agent at www.donlinrecano.com/yfhc. The mailing address for the debtor entities for purposes of these chapter 11 cases is: 1350 E. Newport Center Dr., Suite 110, Deerfield Beach, FL 33442.

Objections, collectively, the "Objections"),[2] and joins in the Debtors' response thereto. In support thereof, BGC and the Buyer respectfully state as follows:

## PRELIMINARY STATEMENT

1. The Debtors' sale of its assets, subject to the rights and conditions in the Stalking Horse Purchase Agreement, to the Buyer is the culmination of months of pre- and post-petition strategic marketing by a seasoned investment banker. As demonstrated at the bidding procedures hearing conducted on November 23, 2020, absent approval of the transaction prior to year end, it would be unlikely that the maximum value for the Debtors' assets could be acquired in these chapter 11 cases and, as a result, maximum benefit to the Debtors' estates could be achieved. Following the robust and comprehensive marketing efforts, the market has determined that the Stalking Horse Bid by the Buyer is the highest and best offer for the Debtors' assets. Despite the Debtors' extensive marketing process, no Qualified Bids for the Debtors' assets were submitted other than the Stalking Horse Bid. The Sale Transaction is simply the best option available in these chapter 11 cases.

2. Accordingly, the Stalking Horse Bid remains the highest, best, and only available offer for the Debtors assets. Notably, the Buyer and the Official Committee of Unsecured Creditors have reached an agreement with respect to the Sale Transaction. For these reasons, approval of the Sale to the Buyer is the best outcome for the Debtors and is in the best interest of

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Motion for Entry of Orders (I)(A) Establishing Bid Procedures Relating to the Sale of the Debtors' Assets, (B) Approving the Debtors' Entry into the Stalking Horse Purchase Agreement, (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Approving Form and Manner of Notices Relating Thereto, and (E) Scheduling a Hearing to Consider the Proposed Sale; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (the "Sale Motion") [Docket No. 17] or the Stalking Horse Purchase Agreement [Docket Nos. 84 & 235], as applicable.

AmericasActive:15271853.5

their estates and all parties in interest and the Court should overrule the objections and approve the Sale to the Buyer.

## ARGUMENT

**A.    Joinder**

3.    The Buyer joins in, incorporates, and adopts, as if set forth herein the arguments and supporting factual allegations set forth in the *Debtors' Omnibus Reply in Support of Sale Motion* [Docket No. 527] (the "Debtors' Reply").  In the interest of time and efficiency, the Buyer will not repeat all of the arguments and supporting facts asserted by the Debtors.

**B.    The Sale is Supported by the Debtors' Sound Business Judgment, is in the Best Interest of the Debtors' Estates, and Represents a Fair and Reasonable Price.**

4.    The Objections provide no basis as to why the Sale should not be authorized.  If approved, the Sale will allow the Debtors' business to continue as a going concern, preserve jobs for the Debtors' employees, preserve vendor and trade relationships, provide for administrative solvency, and provide for certain contracts and leases and other material liabilities to be assumed.  If the Objections are sustained, the outcome will be detrimental to the Debtors, their estates, and all parties in interest.  Failure to close on the agreed terms will not result in the possibility of any plan, or in funding payments to unsecured creditors, but in a conversion, liquidation, or dismissal.  Such an outcome will be far worse for creditors.  Further, the market has spoken.  After a thorough and complete marketing and sale process, no bids higher or better than the Stalking Horse Bid were received. Accordingly, the Stalking Horse Bid remains the best, highest, and only offer available.  As such, the Sale is a proper exercise of the Debtors' business judgment and should be approved.

AmericasActive:15271853.5

C.  **The Blank Objection Should Be Overruled.**

5.  As a preliminary matter, Mr. Blank cancelled his membership with the Debtors prior to the Petition Date in May 2020 and therefore no longer has an existing membership agreement with the Debtors. At best, Mr. Blank has a prepetition general unsecured claim for damages arising under his membership agreement. Mr. Blank has no standing to object to the assumption or rejection of membership agreements. *In re Irwin Yacht Sales, Inc.*, 164 B.R. 678, 680 (Bankr. M.D. Fla. 1994) (holding that a party who did not have an interest in the lease to be assumed has no standing to oppose such assumption). In addition, although Mr. Blank purports to object to the Sale Motion on behalf of "similarly situated class members" in underlying litigation in Broward County, Florida, no class has been certified in that matter. Accordingly, Mr. Blank may only advocate for himself, and Mr. Blank cites no authority to support the position that he can advocate on behalf of any other purported members of the class. *In re ANC Rental Corp.*, Inc., 278 B.R. 714, 719 (Bankr. D. Del. 2002) ("While section 1109 allows a creditor to be heard on any issue in a bankruptcy case, it does not change the general principle of standing that a party may assert only its own legal interests and not the interests of another.").

6.  Nevertheless, Mr. Blank argues that the Buyer is not a good faith purchaser, because the membership agreements must be assumed in order to be sold under the Stalking Horse Purchase Agreement as an Acquired Asset of the Buyer. As noted above, as a preliminary matter, Mr. Blank no longer has an existing membership agreement with the Debtors and thus has no standing to object to the assumption or rejection of the membership agreements. Moreover, Mr. Blank provides no evidence or authority to demonstrate that the Buyer has failed to satisfy the standards of section 363(m) and the assumption of membership agreements is simply not relevant to this analysis. Under section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *See In re Abbots*

4

*Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986).  Throughout these chapter 11 cases, the Buyer has demonstrated that it is a good-faith purchaser under the Bankruptcy Code.  *First*, the Lenders committed to and funded a post-petition financing facility to allow the Debtors to operate in chapter 11 and run a full and fair marketing process.  *Second*, the Lenders agreed to serve as the Stalking Horse Bidder and establish a baseline bid for the assets without the benefit of any bid protections or break-up fees.  Now, pursuant to the Stalking Horse Purchase Agreement, the Buyer seeks approval to purchase the Debtors' assets for value in the form of a credit bid or assumption of at least $75 million of debt plus the assumption of the Assumed Liabilities, including Cure Amounts.  In addition, the DIP Lenders agreed to fully fund the remaining amounts under the DIP Budget, including certain costs associated with the chapter 11 cases, including professional fees of the Debtors and the Committee and $400,000 to complete a wind down of the Debtors' estates, be it through a confirmed plan, conversion to chapter 7, or dismissal.  Moreover, any allegation that the sale process was run for the exclusive benefit of the Lenders in accordance with a timeline this Bankruptcy Court has already approved is unfounded.  There is no evidence of fraud or collusion on behalf of the Buyer, because there is none.  Accordingly, the Buyer has satisfied the standards for a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is entitled to the protections thereunder.

7. Lastly, Mr. Blank argues that the Debtors must assume and assign the membership agreements before the Buyer can purchase them as an Acquired Asset under the Stalking Horse Purchase Agreement.  This is not the case nor, as noted above, does Mr. Blank, who has no membership agreement with the Debtors have standing to make such an argument.  The membership agreements are assets, not executory contracts, because the members' only obligations thereunder are to pay the monthly dues.  *In re SuperMedia, Inc.*, 2013 WL 5567838, at *3 (Bankr. D. Del. Oct. 9, 2013) ("[W]here the payment of money is the only remaining

performance, a contract is not executory."). Accordingly, section 365 of the Bankruptcy Code does not apply and the Debtors do not need to assume and assign those agreements prior to selling the rights thereunder. *See In re Am. Home Mortg. Holdings, Inc.*, 402 B.R. 87, 94 (Bankr. D. Del. 2009) ("[S]ection 363 of the Bankruptcy Code permits a debtor to transfer its rights and obligations under a non-executory contract."); *In re Weinstein Co. Holdings, LLC*, 2020 WL 1640296, at *3 (D. Del. 2020) ("[A] non-executory contract can be transferred to a buyer pursuant to section 363 . . . .") (internal citations omitted). As set forth in greater detail in the Debtors' Reply, as permitted under applicable law, the express terms of the membership agreements and pursuant to standard industry practice, as set forth in the APA, the Buyer is purchasing the Debtors' drafts (i.e., all the rights in connection with the Debtors' membership agreements). [Stalking Horse Purchase Agreement at Section 2.1(b)].

**D.    The Berks Objection Should Be Overruled.**

8.    The Berks Objections assert that the Debtors impermissibly seek to assume and assign certain agreements that they assert are not executory. To be clear, the Buyer is not seeking to assume the agreements at issue at this time. Under the Stalking Horse Purchase Agreement, the Buyer would be purchasing the Debtors' rights (including any rights to enforce non-compete and non-solicit provisions therein) under the following agreements: (a) that certain Preferred Unit Purchase Agreement, dated April 8, 2014 (the "UPA"); (b) that certain Profits Interest Unit Agreement, dated December 31, 2014; and (c) that certain Profits Interest Unit Agreement, dated August 10, 2016 (collectively, (b) and (c), the "Grant Agreements"). Although the UPA and Grant Agreements were included on the Designation List, as noted therein, the inclusion was in an abundance of caution and not an assertion or acknowledgment that such agreements are executory contracts [Stalking Horse Purchase Agreement at Section 2.7]. Nor are the Debtors or Buyers seeking to have this Court determine any party's rights under the UPA or the Grant Agreements.

6

All parties rights thereunder are reserved. Accordingly, such rights can be sold and thus would be Acquired Assets under the Stalking Horse Purchase Agreement. With respect to the UPA or the Grant Agreements, the objection is moot.

9. At this time, the Buyer is also not seeking to assume the Change in Control Severance Agreement, dated September 30, 2019 (the "Severance Agreement"). Although the Severance Agreement was included on the Designation List, as noted therein, the inclusion is in an abundance of caution and not an assertion or acknowledgment that such agreement is an executory contract. At such time as the Buyer seeks to assume such agreement in accordance with the procedures set forth in the Stalking Horse Purchase Agreement and the Sale Order, Ms. Berks-Stross will have an opportunity to object and her rights with respect thereto are reserved. Until that time, there is no ripe controversy for the Court to decide. Accordingly, the objection is moot with respect to the Severance Agreement and should be overruled.

**E.     The Buyer Has Provided Adequate Assurance of Future Performance.**

10. As an initial matter, at this time, the Buyer is not seeking the assumption of the leases or contracts to which objections were filed. Such agreements are on the Designation List. Accordingly, as set forth in the Sale Order, such objectors' rights are reserved until such time as the Buyer seeks the assumption of such agreements and there is no ripe controversy for the Court to decide.

11. Notwithstanding that the assumption and assignment issue is not yet ripe for decision, the Buyer has provided adequate assurance of future performance. Section 365(f) of the Bankruptcy code provides that the "trustee may assign an executory contract or unexpired lease only if— the trustee assumes such contract or lease . . . and adequate assurance of future performance . . . is provided . . . ." 11 U.S.C. § 365(f)(2). The phrase "adequate assurance of future performance" is not defined in the Bankruptcy Code. Rather, the requirement to show

7

"adequate assurance of future performance" depends on the facts and circumstances of each case, and should be given a "practical, pragmatic construction." *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n. 10 (3d Cir. 2001). Moreover, adequate assurance is not an absolute guarantee of performance. *See, e.g., In re DBSI, Inc.*, 405 B.R. at 708; *In re Carlisle,* 103 B.R. at 538 ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."); *In re Decora Indus.*, No. 00-4459 (JJF), 2002 WL 32332749, at *8 (D. Del. May 20, 2002) ("[A]dequate assurance falls short of an absolute guaranty of payment."). Adequate assurance may be provided by demonstrating the assignee's financial stability and experience in managing the type of enterprise or property assigned. *In re Filenes Basement, LLC*, 2014 WL 1713416, at *11-12 (Bankr. D. Del. April 29, 2014) (approving assignment under section 365(f)(2) based on testimony that assignee would be able to satisfy obligations going forward through ongoing equity contributions and assignee had incentive to perform to avoid losing investment).

12. The Buyer has the financial ability to close on the proposed purchase of the Acquired Assets as set forth in the Stalking Horse Purchase Agreement, and has provided the requisite "adequate assurance of future performance." Pursuant to the Stalking Horse Purchase Agreement, the Buyer would be acquiring assets of the Debtors through a credit bid and assumption of debt, subject to its rights thereunder.

13. As part of its adequate assurance package (the "Adequate Assurance Package"), the Buyer provided: (a) the name of the Buyer; (b) the proposed corporate structure chart; (c) a fully executed commitment to fund a working capital facility sufficient to fund projected operational expenses and capital expenditures (the "Working Capital Facility"); and (d) an analysis of the use of the Working Capital Facility with respect to operating projections through December 2021. The

Lenders will be the equity holders of the Buyer, and the Buyer will own 100% of the equity interests in YF FC Operations, LLC ("Opco"), which will own 100% of the equity interests in ten (10) subsidiaries who will hold the leases to be assumed and assigned to the Buyer (the "Assumed Leases").

14. The Lenders have committed to invest in the Buyer through the Working Capital Facility. The Working Capital Facility will be available for use, among other things, to: (a) finance the acquisition; (b) satisfy Assumed Liabilities, including Cure Costs; (c) fund the costs and expenses related to the transaction; (d) finance the ongoing working capital and other general corporate purposes after consummation of the Sale should operating revenues warrant; and (e) invest in capital expenditures to improve the purchased facilities.

15. The Buyer intends to operate the businesses and properties as fitness centers in substantially the same manner as they were operated prior to the Sale. While the Buyer, Opco, and its operating subsidiaries are newly-created entities, the Lenders are well capitalized and sophisticated investors with substantial experience across numerous industries. Importantly, the Buyer intends on retaining the services of Brian Vahaly, the former chief financial officer of [solidcore], and Frank Napolitano, a business development leader with over thirty years' of experience in the gym and fitness space, along with employees of the Debtors who will be hired to supplement their expertise and to ensure a seamless transition. The foregoing capital infusion, along with cash generated from ongoing operations, provides the Buyer with the financial wherewithal to satisfy the Assumed Liabilities and any other obligations that may arise in the ordinary course of business. Accordingly, the Buyer is well positioned to operate the business on a go-forward basis.

WHEREFORE, BGC and the Buyer respectfully request that the Bankruptcy Court enter an order granting the relief requested in the Sale Motion, overruling all other objections thereto, including the Objections, and granting such other and further relief as may be just and proper.

Dated: December 18, 2020
       Wilmington, Delaware

Respectfully Submitted,

/s/ *Joseph M. Mulvihill*
Joseph M. Barry (DE No. 4221)
Joseph M. Mulvihill (DE No. 6061)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: jbarry@ycst.com
Email: jmulvihill@ycst.com

WINSTON & STRAWN LLP
Carey D. Schreiber (admitted *pro hac vice*)
Gregory M. Gartland (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
Email: CSchreiber@winston.com
Email: GGartland@winston.com

*Counsel for the Buyer and the Lenders*