**<u>Exhibit B</u>**

**Blackline Comparing the Revised Proposed Sale Order to the Proposed Sale Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| YOUFIT HEALTH CLUBS, LLC, *et al.*,[1] | Case No. 20-12841 (MFW) |
| | (Jointly Administered) |
| Debtors. | **Ref. Docket Nos. 17, 26, 137, 146** |

**ORDER (I) AUTHORIZING THE SALE OF ALL OF THE DEBTORS'
ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES,
AND OTHER INTERESTS, (II) AUTHORIZING AND APPROVING THE DEBTORS'
PERFORMANCE UNDER THE STALKING HORSE PURCHASE AGREEMENT, (III)
APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN OF THE
DEBTORS' EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED
THERETO AND (IV) GRANTING RELATED RELIEF**

Upon consideration of the motion [Docket No. 17] (the "Motion")[2] of the above-captioned debtors and debtors in possession (the "Debtors") for the entry of an order pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), among other things, (i) authorizing the sale of the Acquired Assets (the "Sale") free and clear of liens, claims, encumbrances, and other interests, except as provided by that Asset Purchase Agreement, dated November 10, 2020, by and between the Debtors (the "Sellers" and each a "Seller") and YF FC Acquisition LLC as the Stalking Horse Bidder (the "Buyer"), as amended by that certain First Amendment to Asset Purchase Agreement, dated as of December 4, 2020 (copies of which are attached hereto as **Exhibit A**, as the same may be further amended, supplemented or otherwise modified in accordance with its terms, together with all exhibits and schedules thereto, the "Stalking Horse Purchase Agreement"), (ii) authorizing the Sellers' performance under the Stalking Horse Purchase Agreement, (iii) approving the assumption and assignment of certain of the Sellers' executory Contracts and unexpired Leases related thereto (any such executory Contract or unexpired Lease assumed and assigned pursuant to the Sale, including any such executory Contract or unexpired Lease placed on the Designation List and assumed and assigned pursuant to the Sale after the Closing Date, an "Assumed Contract"), and (iv) granting related relief; the Court having entered an order approving the Bidding Procedures and granting certain

---

[1]  The last four digits of YouFit Health Clubs, LLC's tax identification number are 6607.  Due to the large number of debtor entities in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the claims and noticing agent at www.donlinrecano.com/yfhc.  The mailing address for the debtor entities for purposes of these chapter 11 cases is: 1350 E. Newport Center Dr., Suite 110, Deerfield Beach, FL 33442.

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in either the Motion or the Stalking Horse Purchase Agreement (as defined herein), as applicable.

related relief on November 23, 2020 [Docket No. 136] (the "Bidding Procedures Order") after a hearing on the same (the "Bidding Procedures Hearing"); and the Debtors having submitted the *Declaration of Richard NeJame in Support of the Bidding Procedures and Sale Motion* [Docket No. 26], the *Declaration of Brian Gleason in Support of the Sale Motion* [Docket No. 526], and the *Supplemental Declaration of Richard NeJame in Support of Sale Motion* [Docket No. 532]; and the Buyer having submitted the *Declaration of Kam Miramadi of Mackinac Partners Regarding Adequate Assurance of Future Performance and in Support of the Sale of Substantially All of the Debtors' Assets* [Docket No. 536]; no auction (the "Auction") having been held because no additional Qualified Bids on the Acquired Assets were received by the Debtors other than the Stalking Horse Bid and the Stalking Horse Purchase Agreement; the Buyer having been deemed the Successful Bidder by the Debtors pursuant to the Bidding Procedures Order; the Debtors having filed a *Notice of Proposed Sale, Bidding Procedures, Auction, and Sale Hearing* [Docket No. 137] (the "Auction and Sale Notice"), a *Notice of Potential Assumption and Assignment* [Docket No. 146] (the "Assumption Notice"), a *First Supplemental Notice of Potential Assumption and Assignment* [Docket No. 210], and a *Notice of Cancellation of Auction* [Docket No. 521]; the Court having conducted a hearing on the Motion on December 23, 2020 (and December 28, 2020 (collectively, the "Sale Hearing") at which time all interested parties were offered an opportunity to be heard with respect to the Motion; the Court having been advised that the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "Committee") provided a draft objection to the Debtors and the Buyer, which objection was resolved as set forth in this Sale Order and as read into the record at the Sale Hearing (the "Committee Objection Resolution"); and the Court having reviewed and considered the Motion and other evidence submitted in support of the Motion, the objections thereto, the Final DIP Order,[3]

the Stalking Horse Purchase Agreement, and the Bidding Procedures Order; upon the record of the hearing on the Final DIP Order (the "Final DIP Hearing"), the Bidding Procedures Hearing and the Sale Hearing; the Court having heard statements and arguments of counsel and the evidence presented with respect to the relief requested in the Motion at the Sale Hearing; due notice of the Motion, the Stalking Horse Purchase Agreement, the Bidding Procedures Hearing, Bidding Procedures Order and the cancellation of the Auction having been provided, and the Member Notice, the Member Notice Period, the Challenge Expiration Notice, and the Challenge Expiration Notice Period (each as defined below) having been approved; the Court having determined that a sound business purpose exists for the Sale, the relief requested in the Motion is

---

[3]    As used herein, "Final DIP Order" shall mean that certain *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Bankruptcy Rule 4001-2 (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors' Limited Use of Cash Collateral, (III) Granting Adequate Protection to the Prepetition Secured Parties, and (IV) Granting Related Relief* [Docket No. 231].

in the best interests of the Debtors, their estates, their stakeholders, and all other parties in interest, the Sale was negotiated and proposed in good faith and the Purchase Price is fair and reasonable and in the best interest of the Debtors' estates; the Court having jurisdiction over this matter; the legal and factual bases set forth in the Motion and at the Sale Hearing establishing just cause for the relief granted herein; and after due deliberation thereon,

**THE COURT HEREBY FURTHER FINDS AND DETERMINES THAT:[4]**

I.      **Jurisdiction, Final Order and Statutory Predicates**

A.      The Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a) and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue is proper in this District and in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      This order (this "Sale Order") constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, expressly waives any stay, and expressly directs entry of judgment as set forth herein.

C.      The statutory predicates for the relief requested in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014 and Local Rule 6004-1.

---

[4]  All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Motion are hereby incorporated herein to the extent not inconsistent herewith.

D.     The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

**II.**     **Notice of the Sale, Auction, and the Cure Amounts**

E.     Actual written notice of the Bidding Procedures Hearing, the Sale Hearing, the Auction, the Motion, the Sale, the assumption, assignment, cure and sale of the Assumed Contracts to be assigned to the Buyer pursuant to the Stalking Horse Purchase Agreement (including, as of the date hereof, those which are identified on **Exhibit B** hereto) has been timely and properly provided to, and a reasonably calculated, fair and reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to, all known interested persons and entities, including, but not limited to the following parties:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (iii) counsel to the DIP Lenders and the DIP Agent (each as defined in the Final DIP Order); (iv) respective counsel to the Prepetition Lender Representative and the Prepetition Agent (each as defined in the Final DIP Order); (v) all other known parties with liens of record on assets of the Debtors and claims against the Debtors as of the Petition Date; (vi) the local office for the Internal Revenue Service; (vii) the Securities and Exchange Commission; (viii) the Office of the United States Attorney for the District of Delaware; (ix) any party having filed requests for notice in the Chapter 11 Cases; (x) the U.S. Department of Justice; (xi) the offices of the attorneys general for the states in which the Debtors operate; (xii) counsel to the Stalking Horse Bidder; (xiii) counsel for the Committee; and (xiv) all parties that had expressed an interest in purchasing the Debtors' assets.  The requirements of Bankruptcy Rule 6004(a) and all applicable Local Rules are satisfied by such notice.

F.     In accordance with the provisions of the Bidding Procedures Order, the Debtors caused the Cure Notice to be served, in compliance with the requirements of due process and the Bankruptcy Code, upon the Buyer and the non-Debtor counterparties to the executory Contracts

or unexpired Leases (each, a "Contract Counterparty," and, collectively, the "Contract Counterparties"), noticing such parties:  (i) that the Sellers may seek to assume and assign the Assumed Contracts on the Closing Date or such later date as contemplated by the terms of the Stalking Horse Purchase Agreement; and (ii) of the relevant Cure Amounts.  The Court finds that:  (i) the Buyer and the Contract Counterparties have had an opportunity to object to the Cure Amounts set forth in the Cure Notice; (ii) the Cure Notice provided the Buyer and the Contract Counterparties with proper notice of the potential assumption and assignment of the Assumed Contracts and any Cure Amount relating thereto; (iii) the service of such Cure Notice was good, sufficient, and appropriate under the circumstances; (iv) no further notice need be given in respect of establishing Cure Amounts for the Assumed Contracts; and (v) the procedures set forth in the Bidding Procedures Order with regard to objecting to any such Cure Amount satisfy the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

G.      The Debtors' Auction and Sale Notice provided all interested persons and entities with timely and proper notice of, and a reasonable opportunity to object and be heard with respect to, the assumption and assignment of the Assumed Contracts, the Sale, the Sale Hearing, and the Auction.

H.      As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, the Bidding Procedures, the assumption and assignment of the Assumed Contracts, the Auction, the cancellation of the Auction, the Sale Hearing, and the Sale has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014.  The Debtors also have complied with all obligations to provide notice of the assumption and assignment of the Assumed Contracts, the Auction, the cancellation of the Auction, the Sale Hearing, and the Sale

required by the Bidding Procedures Order.  In addition, the Debtors have agreed to provide the Member Notice and the Challenge Expiration Notice pursuant to the provisions of this Sale Order.  The notices described in this Section II were, or will be once made with respect to the Member Notice and the Challenge Expiration Notice, good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the assumption and assignment of the Assumed Contracts, the Auction, the cancellation of the Auction, the Sale Hearing, Sale, or the assumption, assignment, and sale of the Assumed Contracts is required.

I.    The disclosures made by the Debtors concerning the Motion, the Bidding Procedures, the Stalking Horse Purchase Agreement, the assumption and assignment of the Assumed Contracts, the cancellation of the Auction, the Sale, and the Sale Hearing, were good, complete, and adequate.

## III.    Good Faith of the Buyer and Sellers

J.    The Buyer is purchasing the Acquired Assets, including all the properties, rights, interests, and other tangible and intangible assets of the Sellers acquired by the Sellers before the Closing, including all of the Sellers' estate's claims and causes of action, including the Sellers' Prepetition Lien and Claim Matters (as defined in the Final DIP Order), the Sellers' fraudulent transfer claims, claims of the Sellers against the Sellers' directors, officers and employees, and claims and causes of action relating to or arising under Chapter 5 of the Bankruptcy Code, including sections 544, 545, 547, 548, and 550, or any other similar state or federal law, and any and all products, rents, offspring, profits, and proceeds of same (collectively, the "Avoidance Actions"), and excluding the Excluded Assets, and not including direct claims or direct causes of action of any Person that is not a Debtor.  The Stalking Horse Purchase Agreement was negotiated, proposed, and entered into by the Sellers and the Buyer, including their respective boards of directors or equivalent governing bodies, officers, directors, employees, agents,

professionals, and representatives, without collusion, in good faith, and from arm's-length bargaining positions. The Buyer is making such purchase in good faith and is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, in that among other things: (i) the Buyer's Qualified Bid contained no break-up fee or expense reimbursement requirement; (ii) the Buyer's Qualified Bid was subject to a marketing process in a time frame approved by the Court through the Bidding Procedures Order; (iii) the Debtors conducted the marketing process in consultation with the Committee and contacted all potential bidders suggested by the Committee; (iv) the Buyer did not attempt to limit the Debtors' freedom to deal with any other party interested in acquiring the Acquired Assets; and (v) all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed. There was no evidence of insider influence or improper conduct by the Buyer in connection with the negotiation of the Stalking Horse Purchase Agreement with the Debtors, no evidence of fraud, collusion, or bad faith on the part of the Buyer, no evidence of the Buyer doing anything to control or otherwise influence the marketing or sale process, including anything to control or otherwise influence the purchase price paid for the Acquired Assets, and no evidence that the Buyer violated section 363(n) of the Bankruptcy Code. The Buyer is not an "insider" of any Debtor (as defined under section 101(31) of the Bankruptcy Code). Accordingly, the Buyer is entitled to the full protections of section 363(m) of the Bankruptcy Code.

K.     As demonstrated by (i) any testimony and other evidence proffered or adduced at the Sale Hearing, and (ii) the representations of counsel made on the record at the Sale Hearing, substantial marketing efforts and a competitive sale process were conducted in accordance with the Bidding Procedures Order and, among other things: (a) the Sellers and the Buyer complied

with the provisions in the Bidding Procedures Order; (b) the Buyer agreed to subject its bid to the competitive Bidding Procedures set forth in the Bidding Procedures Order; and (c) the Buyer in no way improperly induced or caused the chapter 11 filing by the Debtors.

## IV.    <u>Highest and Best Offer</u>

L.      The Debtors' marketing and sale process, including the Debtors' prepetition marketing process, with respect to the Acquired Assets in accordance with the Bidding Procedures, which were followed by the Debtors, afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets.   The Debtors implemented the Bidding Procedures and cancelled the Auction in accordance with the provisions of the Bidding Procedures Order, and the Debtors have otherwise complied with the Bidding Procedures Order in all respects.  Such process was duly noticed and conducted in a noncollusive, fair, and good faith manner, in consultation with the Committee (including contacting all potential bidders suggested by the Committee), and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Acquired Assets.  The Debtors received no Qualified Bids by the Bid Deadline other than the Qualified Bid submitted by the Buyer.  The Bidding Procedures provide that if no Qualified Bids (other than the Qualified Bid submitted by the Buyer) were received by the Bid Deadline, the Auction would not be conducted and the Buyer's Qualified Bid would be the Successful Bid for the Acquired Assets.

M.      The Stalking Horse Purchase Agreement represents a fair and reasonable offer to purchase the Acquired Assets under the circumstances of the Chapter 11 Cases, including in light of the fact that no other Qualified Bids were received.  The consideration provided by the Buyer under the Stalking Horse Purchase Agreement, including the assumption of the Assumed

Liabilities, is fair and adequate, represents the highest and best available offer, including by providing the highest economic value available to the Debtors' estates, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. Accordingly, the Stalking Horse Purchase Agreement constitutes the highest and best offer for the Acquired Assets and a valid, reasonable, and sound exercise of the Debtors' business judgment consistent with their fiduciary duties, and complies in all respects with the Bid Procedures Order.

N.     Approval of the Motion and the Stalking Horse Purchase Agreement and the consummation of the Sale contemplated thereby is in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

**V.     Secured Claims and Credit Bid/Assumption of Debt**

O.     The Buyer is a Delaware limited liability company that was formed on behalf of the Prepetition Lenders and the DIP Lenders, and upon the Closing Date will be owned by the Prepetition Lenders and the DIP Lenders.  Pursuant to the terms of the Stalking Horse Purchase Agreement and the Final DIP Order, (i) the DIP Lenders are secured creditors of the Debtors, holding allowed claims (as that term is defined in section 101(5) of the Bankruptcy Code) in the amount of the DIP Obligations secured by valid, binding, perfected, and enforceable first-priority security interests in and liens against each of the Debtors, their estates, and the property of their estates, subject to any Permitted Encumbrances (as defined in the Final DIP Order), certain amounts of which ~~will~~may be credit bid in connection with the Sale (such DIP Obligations, the "DIP Credit Bid Claim"), and (ii) subject and subordinate to the DIP Obligations, the Prepetition Lenders are secured creditors of the Debtors, holding allowed claims (as that term is defined in section 101(5) of the Bankruptcy Code) in the amount of the Prepetition Liabilities secured by

valid, binding, perfected, and enforceable first-priority security interests in and liens against each of the Debtors, their estates, and the property of their estates, subject to any Permitted Encumbrances, certain amounts of which ~~will~~may be credit bid in connection with the Sale (such Prepetition Liabilities, the "Prepetition Credit Bid Claim" and, together with the DIP Credit Bid Claim, the "Credit Bid Claims"); the amount of such Credit Bid Claims, the "Credit Bid Consideration").  The Buyer, or its assignee, has the right under section 363(k) of the Bankruptcy Code and is authorized by this Court pursuant to the Bidding Procedures Order, the Final DIP Order, and this Sale Order to credit bid and/or assume up to the full amount of the DIP Obligations and Prepetition Liabilities.

P.       Pursuant to the Stalking Horse Purchase Agreement, the Buyer agrees to provide, as consideration for the Acquired Assets, (a) $85 million, payable in the form of, in the Buyer's discretion, (i) Credit Bid Consideration, plus (ii) assumption of DIP Obligations and Prepetition Obligations, plus (b) assumption of the Assumed Liabilities (including the Cure Amounts), comprising the Purchase Price as set forth in Section 2.5 of the Stalking Horse Purchase Agreement.  The Purchase Price is a valid and proper offer pursuant to the Bidding Procedures Order, this Sale Order, and sections 363(b) and 363(k) of the Bankruptcy Code.   After the Closing Date, in accordance with the Committee Objection Resolution, the Prepetition Lenders shall have an allowed general unsecured claim in the aggregate amount of its deficiency not to exceed $23.5 million, with such deficiency claim to be treated as described in the Committee Objection Resolution.

## VI.    No *Sub Rosa* or *De Facto* Plan

Q.       Good and sufficient reasons for approval of the Stalking Horse Purchase Agreement and the transactions to be consummated in connection therewith have been

articulated, and the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.  The Debtors have demonstrated compelling circumstances and good, sufficient, and sound business purposes and justifications for the Sale outside the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, before, and outside of, a plan of reorganization, in that, among other things, the immediate consummation of the Sale with the Buyer is necessary and appropriate to maximize the value of the Debtors' estates, and the Sale will provide the means for the Debtors to maximize distributions to creditors.

R.      The Sale does not constitute a *sub rosa* or *de facto* plan of reorganization or liquidation as it does not propose to (i) impair or restructure existing debt of, or equity interests in, the Debtors, (ii) impair or circumvent voting rights with respect to any plan that may be proposed by the Debtors, (iii) circumvent Chapter 11 safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code, or (iv) classify claims or equity interests or extend debt maturities.  Accordingly, the Sale neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating chapter 11 plan for the Debtors.

## VII.    Successor Liability Matters

S.      By virtue of the consummation of the Sale, (i) the Buyer is not a continuation of the Debtors or their respective estates, there is no continuity between the Buyer and the Debtors, there is no common identity between the Buyer and the Debtors, and there is no continuity of enterprise between the Buyer and the Debtors, (ii) the Buyer is not holding itself out to the public as a continuation of the Debtors or their respective estates, including, but not limited to, as to any warranty or similar obligations, and (iii) the Sale does not amount to a consolidation, merger, or

*de facto* consolidation or merger of the Buyer and any of the Debtors and the Debtors' respective estates. The Buyer is not, and shall not be considered, a successor to the Debtors or their respective estates by reason of any theory of law or equity, including, but not limited to, under any federal, state or local statute or common law, or revenue, pension, ERISA, tax, labor, employment, environmental, escheat or unclaimed property laws, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules, or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine or common law, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, and the Buyer and its affiliates shall have no liability or obligation under the Workers Adjustment and Retraining Act (the "WARN Act"), 929 U.S.C. §§ 210 et seq. and shall not be deemed to be a "successor employer" for purposes of the Internal Revenue Code of 1986, Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, the Americans with Disability Act, the Family Medical Leave Act, the National Labor Relations Act, the Labor Management Relations Act, the Older Workers Benefit Protection Act, the Equal Pay Act, the Civil Rights Act of 1866 (42 U.S.C. 1981), the Employee Retirement Income Security Act, the Multiemployer Pension Protection Act, the Pension Protection Act, and/or the Fair Labor Standards Act; the Buyer is not a continuation or substantial continuation of any of the Debtors or their respective estates, business or operations or any enterprise of the Debtors; the Buyer does not have a common identity of incorporators, directors or equity holders with the Debtors; and the Sale does not amount to a consolidation, merger, or *de facto* merger of the Buyer and the Debtors or their respective estates. Accordingly, the Buyer is not and shall not be deemed a

successor to the Debtors or their respective estates as a result of the consummation of the Sale pursuant to the Stalking Horse Purchase Agreement and this Sale Order.

## VIII.    No Fraudulent Transfer; Validity of Transfer

T.       The Stalking Horse Purchase Agreement was not entered into by the Buyer and the Sellers for the purpose of hindering, delaying, or defrauding creditors under either the Bankruptcy Code or the other laws of the United States, or the laws of any state, territory, possession, or the District of Columbia (including, without limitation, the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act).  Neither the Debtors nor the Buyer entered into the Stalking Horse Purchase Agreement fraudulently, nor are they are entering into or consummating the transactions contemplated by the Stalking Horse Purchase Agreement fraudulently, including under applicable federal and state fraudulent conveyance and fraudulent transfer laws.  The consideration provided by the Buyer pursuant to the Stalking Horse Purchase Agreement, (i) was negotiated at arm's-length, (ii) is fair, adequate, and reasonable, (iii) is the highest or otherwise best offer for the Acquired Assets, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the other laws of the United States, and the laws of any state, territory, possession, or the District of Columbia (including, without limitation, the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act).  No other person or entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than the Buyer.  For the purposes of statutory and common law fraudulent conveyance and fraudulent transfer claims, neither the Sellers nor the Buyer are entering into or consummating the transactions contemplated by the Stalking Horse Purchase Agreement fraudulently.  Approval of the Motion, the Stalking Horse

Purchase Agreement, the Sale, and the consummation of the transactions contemplated thereby is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

U.    The Debtors are the sole and lawful owners of the Acquired Assets.  The Acquired Assets constitute property of the Debtors' estates and title to the Acquired Assets is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  The Sellers and the Buyer have full corporate power and authority to execute, deliver, and perform the Stalking Horse Purchase Agreement and all other documents contemplated thereby, and no further consents or approvals are required for the Sellers or the Buyer to consummate the transactions contemplated by the Stalking Horse Purchase Agreement or the other documents contemplated thereby, except as otherwise set forth in the Stalking Horse Purchase Agreement or such other documents.

V.    Subject to section 363(f) of the Bankruptcy Code, the transfer of each of the Acquired Assets to the Buyer will be, as of the Closing Date, a legal, valid, and effective transfer of the Acquired Assets, which transfer vests or will vest the Buyer with all right, title, and interest of the Debtors in, to, and under the Acquired Assets free and clear of (i) all Liens (as defined in the Stalking Horse Purchase Agreement) and other liens (including any liens as that term is defined in section 101(37) of the Bankruptcy Code) and encumbrances relating to, accruing, or arising at any time prior to the Closing Date (collectively, as defined in this clause (i) and as set forth in clauses (i)–(vii) of Paragraph W below, the "Liens"), other than Permitted Liens (as defined in the Stalking Horse Purchase Agreement), and (ii) all debts arising under, relating to, or in connection with any act of the Debtors, claims (as that term is defined in section 101(5) of the Bankruptcy Code) or causes of action, liabilities, obligations, demands, guaranties, options in favor of third parties, rights, easements, servitudes, restrictive covenants,

encroachments, contractual commitments, restrictions, interests, mortgages, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, leases, subleases, licenses, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, judgments, claims for reimbursement, contribution, indemnity, exoneration, infringement, products liability, alter-ego, and matters of any kind and nature, including any Challenge (as defined in the Final DIP Order), whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity, or otherwise, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto (a) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtors' or the Buyer's interests in the Acquired Assets, or any similar rights, or (b) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including without limitation, any restriction of use, voting, transfer, receipt of income or other exercise of any attributes of ownership (collectively, as defined in this clause (ii) and as set forth in clauses (i)–(vii) of Paragraph W below, the "Claims"), relating to, accruing or arising at any time prior to entry of this Sale Order, other than Assumed Liabilities, including amounts necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all defaults and pay all actual pecuniary losses under the Assumed Contracts (the "Cure Amounts") or any other obligations arising under the Assumed Contracts to the extent set forth in the Stalking Horse Purchase Agreement or this Sale Order.

## IX.    Section 363(f) Is Satisfied

W.    The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtors may sell the Acquired Assets free and clear of any interests in the

~~property~~Acquired Assets; *provided, however*, that the provisions of this Sale Order and the sale and transfer to the Buyer of any Acquired Assets that are customer accounts, customer purchases, customer lists, membership or personal training agreements, or Membership Information (collectively, the "Membership Assets"), shall be subject to the Member Notice Period provisions set forth in paragraph 9(b) hereof.  The Buyer would not have entered into the Stalking Horse Purchase Agreement and would not consummate the transactions contemplated thereby if the sale of the Acquired Assets to the Buyer and the assumption, assignment, and sale of the Assumed Contracts to the Buyer were not, except as otherwise provided in the Stalking Horse Purchase Agreement with respect to the Assumed Liabilities and Permitted Liens, free and clear of all Claims and Liens of any kind or nature whatsoever of the Sellers, or if the Buyer would, or in the future could (except and only to the extent expressly provided in the Stalking Horse Purchase Agreement and with respect to the Assumed Liabilities and Permitted Liens), be liable for any of such Claims and Liens, including, but not limited to, Claims and Liens in respect of the following:  (i) all mortgages, deeds of trust, and security interests; (ii) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Sellers; (iii) any other employee, worker's compensation, occupational disease, unemployment, or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Notification Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the

Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state discrimination laws, (k) state unemployment compensation laws or any other similar state laws, or (l) any other state or federal benefits or claims relating to any employment with the Sellers or any of its predecessors; (iv) any bulk sales or similar law; (v) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (vi) any environmental laws, including any Environmental, Health and Safety Requirement(s); and (vii) any theories of successor or transferee liability.

X.    The Sellers may sell the Acquired Assets free and clear of all Claims and Liens against the Sellers, their respective estates, or any of the Acquired Assets (except for any Assumed Liabilities and Permitted Liens under the Stalking Horse Purchase Agreement) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Holders of such Claims or Liens fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Claims or Liens attach to the net cash proceeds of the Sale, if any, ultimately attributable to the Acquired Assets in which such creditor or interest holder alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor or interest holder had prior to the Sale, subject to any claims and defenses the Sellers and their estates may possess with respect thereto.  Those holders of Claims or Liens against or in the Sellers, their estates or any of the Acquired Assets who did not object, who withdrew their objection, or whose objection was overruled, to the Sale or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

Y.    The sale, conveyance, assignment and transfer of any personally identifiable information pursuant to the terms of the Stalking Horse Purchase Agreement and this Sale Order

complies with the terms of the Debtors' policy regarding the transfer of such personally identifiable information as of the Petition Date and, as a result, consummation of the Sale is permitted pursuant to Section 363(b)(1)(A) of the Bankruptcy Code.  Accordingly, appointment of a consumer privacy ombudsman in accordance with sections 363(b)(1) or 332 of the Bankruptcy Code is not required with respect to the Sale.

## X.    **Assumption and Assignment of the Assumed Contracts**

Z.    The assumption and assignment of the Assumed Contracts pursuant to the terms of this Sale Order is integral to the Stalking Horse Purchase Agreement and is in the best interests of the Debtors and their estates, creditors, interest holders, and other parties in interest and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

AA.    The Cure Amounts set forth on **Exhibit B** annexed hereto are the sole amounts necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all monetary defaults and pay all actual pecuniary losses under the Assumed Contracts.

BB.    Pursuant to the terms of the Stalking Horse Purchase Agreement and this Sale Order, the Buyer shall have:  (i) either or both cured and provided adequate assurance of cure of any defaults existing before the Closing Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; and (ii) provided compensation or adequate assurance of compensation to any party for actual pecuniary loss to such party resulting from a default prior to the Closing Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.  After the payment of the relevant Cure Amounts by the Buyer and as required by the Stalking Horse Purchase Agreement and this Sale Order, the Sellers shall not have any further liabilities to the Contract Counterparties on or after

the applicable Assumption Effective Date.[5]  The Buyer provided adequate assurance of its future performance under the relevant Assumed Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.  Other than the Adjourned Objections (as defined below), any non-Debtor counterparty to an Assumed Contract who did not timely file an objection to the assumption of its Assumed Contract shall be deemed to have consented to its assumption and assignment to the Buyer pursuant to section 365 of the Bankruptcy Code in accordance with the Stalking Horse Purchase Agreement.

CC.    No default exists in the Sellers' performance under the Assumed Contracts as of the Closing Date other than the failure to pay Cure Amounts or defaults that are not required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code.

## XI.    Compelling Circumstances for an Immediate Sale

DD.    Good and sufficient reasons for approval of the Stalking Horse Purchase Agreement and the Sale have been articulated.  The relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.  To maximize the value of the Debtors' assets and preserve the viability of the business to which the Acquired Assets relate, it is essential that the Sale be approved and occur promptly within the time constraints set forth in the Stalking Horse Purchase Agreement.  Time is of the essence in effectuating the Stalking Horse Purchase Agreement and consummating the Sale, both to preserve and maximize the value of the Debtors' assets for the benefit of the Debtors, their estates, their creditors, interest holders, and all other parties in interest in the Chapter 11 Cases and to provide the means for the Debtors to maximize creditor and interest holder recoveries.  As

---

[5] For the avoidance of doubt, with respect to any Designated Contract that is assumed and assigned to the Buyer in accordance with the Stalking Horse Purchase Agreement and Paragraph 2223 of this Sale Order, "Assumption Effective Date" shall mean either such date as identified as identified in a separate order of this Court approving the assumption and assignment or the later of: (i) the Objection Deadline (as defined below); or (ii) the date of resolution of any timely objection to the assumption and assignment of such Designated Contract in accordance with Paragraph 2223 of this Sale Order.

such, the Debtors and the Buyer intend to close the Sale of the Acquired Assets as soon as reasonably practicable. The Debtors have demonstrated both compelling circumstances and a good, sufficient, and sound business purpose and justification for immediate approval and consummation of the Stalking Horse Purchase Agreement.

EE.    The consummation of the transactions set forth in the Stalking Horse Purchase Agreement and the assumption and assignment of the Assumed Contracts are legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f), and all of the applicable requirements of such sections have been complied with in respect of such transactions.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**General Provisions**

1.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the Chapter 11 Cases pursuant to Bankruptcy Rule 9014. To the extent that any findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are adopted as such. Any findings of fact or conclusions of law stated by the Court on the record at the Sale Hearing are hereby incorporated.

2.    The relief requested in the Motion is granted and the transactions contemplated thereby and by the Stalking Horse Purchase Agreement are approved for the reasons set forth in this Sale Order and on the record of the Sale Hearing, which is incorporated fully herein as if fully set forth in this Sale Order, and the Sale contemplated by the Stalking Horse Purchase Agreement is approved.

3.       Other than the Adjourned Objections, all objections, statements, and reservations of rights to the Motion and the relief requested therein and to the entry of this Sale Order or the relief granted herein, that have not been withdrawn, waived, adjourned, settled as announced to the Court (including the Committee Objection Resolution) at any prior hearing, at the Sale Hearing, or by stipulation filed with the Court, or previously overruled, including, without limitation, all reservations of rights included therein or otherwise, are hereby overruled and denied on the merits with prejudice, except as expressly set forth herein.  Those parties who did not object, or withdrew their objections, to the Motion, are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.

4.       This Court's findings of fact and conclusions of law set forth in the Bidding Procedures Order and the Final DIP Order are incorporated herein by reference.

**Approval of the Stalking Horse Purchase Agreement**

5.       The Stalking Horse Purchase Agreement and all other ancillary documents, and all of the respective terms and conditions thereof, including the Credit Bid Claims and the Credit Bid Consideration, the Sale contemplated thereby, and the Purchase Price are hereby approved. The Sellers are authorized to enter into the Stalking Horse Purchase Agreement and all other ancillary documents to be executed in connection with the Stalking Horse Purchase Agreement as may be necessary.

6.       Pursuant to sections 363 and 365 of the Bankruptcy Code, entry by the Sellers into the Stalking Horse Purchase Agreement is hereby authorized and approved.  The Sellers and the Buyer acting by and through their existing agents, representatives, and officers are authorized, empowered and directed, without further order of this Court, to use their reasonable best efforts to take any and all actions necessary or appropriate to (i) consummate and close the Sale in

accordance with the terms and conditions of the Stalking Horse Purchase Agreement and this Sale Order, (ii) transfer and assign all rights, title, and interest to all assets, property, licenses, and rights of the Sellers to be conveyed in accordance with the terms and conditions of the Stalking Horse Purchase Agreement, and (iii) execute and deliver, perform under, consummate, implement, and close fully the Stalking Horse Purchase Agreement, including the assumption and assignment to the Buyer of the Assumed Contracts, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Stalking Horse Purchase Agreement and the Sale, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Stalking Horse Purchase Agreement, this Sale Order, and such other ancillary documents, including any actions that otherwise would require further approval by shareholders, members, or their boards of directors, as the case may be, without the need to obtain such approvals.  The Sellers are hereby authorized to perform their covenants and undertakings as provided in the Stalking Horse Purchase Agreement and any ancillary documents before or after the Closing Date without further order of the Court.  Neither the Buyer nor the Sellers shall have any obligation to proceed with the Closing under the Stalking Horse Purchase Agreement until all conditions precedent to their obligations to do so have been met, satisfied, or waived, except as otherwise contemplated and provided for in the Stalking Horse Purchase Agreement and this Sale Order.

7.      This Sale Order and the Stalking Horse Purchase Agreement shall be binding in all respects upon the Debtors, including the Debtors' estates, all holders of equity interests in any Debtor, all holders of Claims or Liens (whether known or unknown) against any Debtor, including the Committee, any holders of Claims or Liens against or on all or any portion of the

Acquired Assets, all Contract Counterparties, the Buyer and all successors and assigns of the Buyer, the Acquired Assets, all successors and assigns of the Debtors, any party in interest with standing to commence a Challenge, and any subsequent trustees appointed in any of the Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Chapter 11 Cases, and shall not be subject to rejection or unwinding.  This Sale Order and the Stalking Horse Purchase Agreement shall inure to the benefit of the Debtors, their estates, their creditors, the Buyer and their respective successors and assigns.  Nothing in any chapter 11 plan confirmed in the Chapter 11 Cases, the confirmation order confirming any such chapter 11 plan, any order approving the wind down or dismissal of the Chapter 11 Cases, or any order entered upon the conversion of the Chapter 11 Cases to one or more cases under chapter 7 of the Bankruptcy Code or otherwise shall alter, conflict with, or derogate from, the provisions of the Stalking Horse Purchase Agreement or this Sale Order.

8.    Upon the entry of this Sale Order (i) the Challenge Deadline ~~(as defined in the Final DIP Order)~~[6]  and the rights set forth in Paragraph 16(a) of the Final DIP Order shall automatically expire and (ii) no subsequent trustee (including any Chapter 7 trustee), responsible person, examiner with expanded powers, any other estate representative, or any party-in-interest and all of their successors-in-interest and assigns, including, without limitation, the Committee, shall have any right to pursue any Challenge against any lender, the agent (and any former agent), or any predecessor thereof.  The admissions, stipulations agreements, releases and waivers provided for in the Final DIP Order, including, but not limited to, Paragraph C thereof, shall be effective on a final basis and shall be binding, conclusive and final on any subsequent trustee (including any Chapter 7 trustee), responsible person, examiner with expanded powers, any other

---

[6] Capitalized terms used in this paragraph not otherwise defined herein shall have the meanings ascribed to them in the Final DIP Order.

estate representative, any person, entity and party-in-interest and all of their successors-in-interest and assigns, including, without limitation, the Committee, and in any successor case and shall not be subject to challenge or objection by any such party, as set forth in Paragraph 16(b) of the Final DIP Order.  The DIP Agent or the Lender Representative (in its capacity as such or as sub-agent), at the direction of the Required DIP Lenders, and the Prepetition Agent or the Lender Representative (in its capacity as sub-agent), at the direction of the Required Lenders (as defined in the Prepetition Credit Agreement) (or the respective designees of any of the foregoing) shall have the exclusive rights set forth in Paragraph 32 of the Final DIP Order, without regard to Paragraph 16 thereof.[6]  Within one (1) business day of entry of this Sale Order, the Debtors shall provide fourteen (14) days' notice to parties-in-interest of the expiration of the Challenge Deadline (as set forth herein) pursuant to the Committee Objection Resolution (the "Challenge Expiration Notice Period") in the form of notice attached hereto as **Exhibit C** (the "Challenge Expiration Notice").  Service shall be effectuated by the Debtors on the parties on the 2002 Service List and any other party on whom the Debtors served the Final DIP Order.  Upon the expiration of such fourteen (14) day period, the expiration of the Challenge Deadline shall be applicable to all parties-in-interest (other than the Debtors and the Committee for whom the Challenge Deadline expires immediately upon entry of this Sale Order).  If any objection to the expiration of the Challenge Deadline is timely filed by a party-in-interest (other than the Debtors and the Committee) prior to the expiration of the fourteen (14) day period, the Challenge Deadline is deemed extended through the earlier of (i) the Challenge Deadline (as set forth in the Final DIP Order solely for such party filing such objection), (ii) the date such objection is resolved amongst the DIP Agent, the DIP Lenders, the Debtors, and the objecting party, or (iii)

---

[6] Capitalized terms used in this paragraph not otherwise defined herein shall have the meanings ascribed to them in the Final DIP Order.

the date the Court acts on such objection.  To the extent any such objections are filed and not resolved among the DIP Agent, the DIP Lenders, the Debtors, and the objecting party, if any, such parties' rights are reserved to request a hearing on the matter on shortened notice.

**Transfer of the Acquired Assets**

9.    (a)    Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Sellers are authorized and directed to transfer the Acquired Assets to the Buyer on the Closing Date.  The transfer of the Acquired Assets to the Buyer under the Stalking Horse Purchase Agreement does not require any consents other than as specifically provided for in the Stalking Horse Purchase Agreement.  The transfer of the Sellers' rights, title, and interest in the Acquired Assets to the Buyer pursuant to the Stalking Horse Purchase Agreement and this Sale Order shall be deemed transferred to the Buyer upon and as of the Closing Date, and such transfer of the Acquired Assets and the consummation of the Sale and any related actions contemplated thereby constitute a legal, valid, binding, and effective transfer of the Sellers' right, title, and interest in the Acquired Assets and shall vest the Buyer with all the rights, title and interest of the Sellers in and to the Acquired Assets as set forth in the Stalking Horse Purchase Agreement, free and clear of all Claims and Liens (except Assumed Liabilities and Permitted Liens).  Upon the Closing, the Buyer shall take title to and possession of the Acquired Assets subject only to the Assumed Liabilities and Permitted Liens.  Pursuant to section 363(f) of the Bankruptcy Code, the transfer of title to the Acquired Assets and the Assumed Contracts shall be free and clear of all Claims and Liens including, without limitation, all Claims pursuant to any successor or successor-in-interest liability theory, except for Assumed Liabilities and Permitted Liens.

(b) Within one (1) business day of entry of this Sale Order, the Debtors will provide notice to the Debtors' current members (the "Members") of the sale and transfer of the

Membership Assets free and clear of any and all Claims and Liens pursuant to section 363 of the Bankruptcy Code in the form of notice attached hereto as **Exhibit D** (the "Member Notice") by (a) sending the Member Notice by electronic mail to the Members for whom the Debtors have electronic mail addresses, (b) posting the Member Notice in each of the Debtors' open club locations, (c) posting the Member Notice on the Debtors' website, and (d) posting the Member Notice on the website of the Court-appointed claims and noticing agent.  Members will be afforded fourteen (14) days (the "Member Notice Period") from the transmittal or posting of the Member Notice to object to the sale of their Member Asset and all of their rights in this regard are expressly reserved during such Member Notice Period.  To the extent a Member does not object within the Member Notice Period, notwithstanding anything in the Stalking Horse Purchase Agreement, the Membership Assets of such Member shall be Acquired Assets under Section 2.1(b) of the Stalking Horse Purchase Agreement and the findings of fact and conclusions of law applicable to Acquired Assets under this Sale Order shall apply to such Membership Assets without further order of the Court; *provided* that the Buyer may designate Membership Assets as Excluded Assets or Delayed Acquired Assets (as defined below).  To the extent a Member timely objects to the sale of its Membership Assets, the findings of fact and conclusions of law applicable to Acquired Assets under this Sale Order shall not apply solely as to that Member's Membership Assets or any Claims of such Member pertaining to such Membership Assets pending resolution among the Debtors, the Buyer, and the objecting party, if any, or, to the extent the parties cannot resolve such objection, further Court order.  To the extent any such objections are filed and not resolved, such parties' rights are reserved to request a hearing on the matter on shortened notice.

10.    All of the rights of the Buyer, the DIP Agent, and the DIP Lenders under the Stalking Horse Purchase Agreement and the DIP Credit Documents are fully reserved. Notwithstanding anything therein or herein to the contrary, it shall be a condition to the Buyer's obligation to close the Sale that the transaction (including resolution of the Challenge Deadline expiration and purchase of the Membership Assets) be satisfactory to the Buyer in its sole discretion . Notwithstanding anything to the contrary in the Stalking Horse Purchase Agreement, including Section 8.2 thereof, upon any termination by the Buyer as a result of the conditions set forth herein, all rights and obligations of the Parties under the Stalking Horse Purchase Agreement shall automatically end without Liability against any other Party or its Affiliates except that Section 5.7 and Article IX (other than Section 9.9) shall remain in full force and survive any termination by the Buyer of the Stalking Horse Asset Purchase Agreement.  Nothing herein shall permit the Sellers to terminate the Stalking Horse Asset Purchase Agreement.  The Buyer, the DIP Agent, and the DIP Lender are not waiving any existing or future defaults or events of default under the DIP Credit Documents or the Stalking Horse Purchase Agreement nor are the Buyer, the DIP Agent, and the DIP Lenders committing, agreeing, or required to amend, forbear, extend (including extend the Scheduled Maturity Date or the End Date), otherwise modify the DIP Credit Documents, or provide additional funding thereunder after (i) the occurrence of an Event of Default under the DIP Credit Documents other than failure of this Sale Hearing to be concluded by December 24, 2020 or (ii) the Scheduled Maturity Date; *provided, however*, nothing in this Sale Order shall prevent the Debtors, the DIP Agent or the DIP Lenders from agreeing to modify the DIP Credit Documents (including to provide additional funding thereunder), subject to any required notice and/or approval by this Court..[7]

---

[7] Capitalized terms used in this paragraph not otherwise defined herein shall have the meanings ascribed to them in the Final DIP Order.

11.    ~~10.~~ The sale of the Avoidance Actions pursuant to the Stalking Horse Purchase Agreement is hereby approved; *provided* that, as provided for in the Committee Objection Resolution, the Avoidance Actions and proceeds thereof set forth on **Exhibit ~~C~~E** attached hereto shall not be Acquired Assets of the Buyer as of the Closing Date and shall vest in a liquidating trust for the specific benefit of general unsecured creditors in accordance with any confirmed chapter 11 plan in these Chapter 11 Cases (the "Committee Avoidance Actions"); *provided, however,* if no chapter 11 plan is confirmed in these Chapter 11 Cases, without further order of this Court and without further action of any party, upon the conversion of the Chapter 11 Cases to chapter 7, or dismissal of the Chapter 11 Cases, the Committee Avoidance Actions shall be Acquired Assets under the Stalking Horse Purchase Agreement and this Sale Order.  Standing to file, prosecute, settle any and all claims or causes of action that are Acquired Assets, including, but not limited to, the Avoidance Actions (other than the Committee Avoidance Actions, to the extent not an Acquired Asset in accordance with this Paragraph ~~10~~11) shall be irrevocably vested in the Buyer to the fullest extent permitted by applicable law and the Buyer shall have the unconditional right to file, prosecute, settle, and/or collect such claims or causes of action, including, but not limited to, the Avoidance Actions (other than the Committee Avoidance Actions, to the extent not an Acquired Asset in accordance with this Paragraph ~~10~~11), in the name of the Debtors or on the Debtors' behalf as if such claims or causes of action, including, but not limited to, the Avoidance Actions (other than the Committee Avoidance Actions, to the extent not an Acquired Asset in accordance with this Paragraph ~~10~~11), were retained by the Debtors and is hereby appointed irrevocable attorney-in-fact for that purpose.

12.    ~~11.~~ On the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all

of the Sellers' rights, title, and interest in the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired Assets to the Buyer on the Closing Date pursuant to the terms of the Stalking Horse Purchase Agreement and this Sale Order, free and clear of all Claims and Liens (other than Assumed Liabilities and Permitted Liens).  For the avoidance of doubt, the Excluded Assets set forth in the Stalking Horse Purchase Agreement and herein are not included in the Acquired Assets, and the Excluded Liabilities set forth in the Stalking Horse Purchase Agreement and herein are not Assumed Liabilities.

13.    12. The Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Sellers constituting Acquired Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date as provided by the Stalking Horse Purchase Agreement.  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any grant, permit, or license relating to the operation of the Acquired Assets sold, transferred, assigned, or conveyed to the Buyer on account of the filing or pendency of the Chapter 11 Cases or the consummation of the Sale.

14.    13. Except with respect to Assumed Liabilities and Permitted Liens, all persons and entities holding Claims against the Debtors or Claims or Liens in all or any portion of the Acquired Assets arising under or out of, in connection with or in any way relating to the Debtors, the Acquired Assets, the operation of the Debtors' business prior to the Closing Date, the transfer of the Acquired Assets to the Buyer, or otherwise, are hereby forever barred, estopped, and permanently enjoined from asserting against the Buyer or its successors or assigns, their property, or the Acquired Assets such persons' or entities' Claims against the Debtors or Claims or Liens

in and to the Acquired Assets.  On and after the Closing Date, each creditor is authorized and directed to execute such documents and take all other actions as may be deemed by the Buyer to be necessary or desirable to evidence the release of Claims or Liens, if any, as provided for herein, as such Claim or Lien may have been recorded or may otherwise exist.

15.    14. All persons and entities that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets to be sold, transferred, or conveyed (wherever located) to the Buyer pursuant to the Stalking Horse Purchase Agreement are hereby directed to surrender possession of such Acquired Assets to the Buyer on the Closing Date.  To the extent that any such person or entity fails or refuses to surrender possession of such Acquired Assets on or after the Closing Date, the Buyer has the right to commence a turnover action and have it considered on an expedited basis.  All persons are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with, or which would be inconsistent with, the ability of the Sellers to sell and transfer any or all of the Acquired Assets to the Buyer, or the ability of the Buyer to take title and possession of any or all of the Acquired Assets, in accordance with the terms of the Stalking Horse Purchase Agreement and this Sale Order.

16.    15. This Sale Order is and shall be effective as a determination that, as of the Closing Date, all Claims and Liens of any kind or nature whatsoever existing as to the Acquired Assets before the Closing, other than Assumed Liabilities and Permitted Liens, or as otherwise provided in this Sale Order, shall have been unconditionally released, discharged, and terminated. Moreover, this Sale Order is and shall be effective as a determination that, as of the Closing Date, the conveyances described herein have been affected, with all such Claims and Liens to attach to any net proceeds received by the Sellers ultimately attributable to the Acquired Assets against, or in, which such Claims or Liens are asserted, subject to the terms thereof, with the

same validity, force, and effect, and in the same order of priority, which such Claims or Liens now have against the Acquired Assets, subject to any rights, claims, and defenses that the Sellers or their estates, as applicable, may possess with respect thereto.

17. 16. This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing persons and entities is hereby authorized and directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Stalking Horse Purchase Agreement.

18. 17. Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Stalking Horse Purchase Agreement. A certified copy of this Sale Order may be: (i) filed with the appropriate clerk; (ii) recorded with the recorder; or (iii) filed or recorded with any other governmental agency to act to cancel any of the Claims, Liens, and other encumbrances of record.

19. 18. If any person or entity that has filed statements or other documents or agreements evidencing Claims or Liens in all or any portion of the Acquired Assets has not delivered to the Sellers prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of Liens and

Claims and any other documents necessary or desirable to the Buyer for the purpose of documenting the release of all Claims and Liens (other than Assumed Liabilities or Permitted Liens), which the person or entity has or may assert with respect to all or any portion of the Acquired Assets, then the Buyer and the Sellers are hereby authorized to execute and file such statements, instruments, releases and other documents in the name and on behalf of such person or entity with respect to the Acquired Assets; *provided* that, notwithstanding anything in this Sale Order or the Stalking Horse Purchase Agreement to the contrary, the provisions of this Sale Order shall be self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order.

**DIP Facility Obligations; Continuing Lien**

20.    ~~19.~~ On the Closing Date, subject only to retaining Excluded Cash, the Debtors shall pay directly to the Buyer all remaining cash collateral and all cash in immediately available funds, without deduction or setoff, which payment shall be indefeasible once made, and not subject to recovery, diminution, reduction, or reversal on any basis, free and clear of all Claims, Liens, interests and encumbrances, including those of the Prepetition Secured Parties (as defined in the Final DIP Order) under the Final DIP Order.  Notwithstanding anything to the contrary contained in this Sale Order or otherwise, the liens and claims of the DIP Agent and the DIP Lenders (each as defined in the Final DIP Order), as applicable, pursuant to the Final DIP Order shall continue to attach to all cash and cash collateral remaining at the Debtors, including the Excluded Cash, with the same priority, validity, extent, force, and effect as they now have to secure the obligations owed by the Debtors to the Buyer to pay to the Buyer any funds remaining in the Debtors' accounts after payment of the amounts set forth in the Approved DIP Budget (as

defined in the Final DIP Order); *provided, however*, that notwithstanding the occurrence of the Scheduled Maturity Date (as defined in the Final DIP Order), the Debtors shall be authorized to continue to use Excluded Cash to fund the Approved DIP Budget in accordance with the Final DIP Order and to fund costs incurred in performing their obligations under any Transition Services Agreement in accordance with an agreement with the Buyer, including on a budget with respect thereto.  At such time as the funds remaining at the Debtors are no longer necessary to fund the Approved DIP Budget or agreed costs incurred in performing their obligations under any Transition Services Agreement, such funds shall be promptly paid to the Buyer and the Final DIP Order and all the rights, claims, and interests of the DIP Agent and the DIP Lenders, as applicable, pursuant thereto shall remain in full force and effect until such payments have been indefeasibly paid in cash to the Buyer.

21.    20. Without limitation to the other provisions of this Sale Order, at the Closing, the Prepetition Secured Parties (as such term is defined in the Final DIP Order), shall execute such documents and take such other actions as may be reasonably necessary to release their Claims and Liens in and to the Cash of the Debtors as of the Closing that is transferred to the Buyer; *provided*, *however*, any failure to do so shall not in any way affect the validity of such transfer pursuant to this Sale Order.

**Assumed Contracts**

22.    21. The Sellers are hereby authorized and directed in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to (a) assume and assign the Assumed Contracts to the Buyer free and clear of all Claims, Liens, and other interests of any kind or nature whatsoever (other than the Assumed Liabilities), subject to the terms of the Stalking Horse Purchase Agreement and this Sale Order, as of the applicable Assumption Effective Date and (b) execute

and deliver to the Buyer such documents or other instruments as the Buyer deems necessary to assign and transfer the Assumed Contracts to the Buyer in accordance with the Stalking Horse Purchase Agreement.  The payment of the applicable Cure Amounts (if any) by the Buyer as required by the Stalking Horse Purchase Agreement and this Sale Order shall (i) effect a cure of all defaults existing thereunder as of the applicable Assumption Effective Date, (ii) compensate for any actual pecuniary loss to the applicable Contract Counterparty resulting from such default, and (iii) together with the assignment by the Sellers to and the assumption of the Assumed Contracts by the Buyer, constitute adequate assurance of future performance thereof.

23.    22. On the Closing Date, the Debtors shall assume and assign to Buyer each Assumed Contract designated by Buyer for assumption and assignment on the Closing Date in accordance with the Stalking Horse Purchase Agreement and this Sale Order, and which Assumed Contracts are set forth on **Exhibit B** attached hereto.  In accordance with the terms of the Stalking Horse Purchase Agreement and this Sale Order, through the earlier of (i) the ninety (90) days following the Closing Date and (ii) the expiration of the Debtors' deadline to assume or reject unexpired leases of non-residential real property pursuant to section 365(d)(4) of the Bankruptcy Code, subject to any and all rights to seek an extension thereof  (the "Designation Rights Period"), the Buyer may deliver written notice (each, a "Designation Notice") to the Debtors designating any Contract or Lease (each a "Designated Contract") set forth on the notice attached hereto as **Exhibit DF-1**, including, but not limited to, those set forth on **Exhibit DF-2** (collectively, the "Notice of Designated Contracts") for either:  (a) assumption and assignment to the Buyer, or (ii) rejection.  Any such Designation Notice must be provided by the Buyer to the Debtors at least three (3) Business Days prior to the expiration of the Designation Rights Period. Within two (2) Business Days following the Debtors' receipt of any such Designation Notice, the

Debtors shall file a notice on the docket in the above-captioned case and provide notice to the counterparty to such Designated Contract (each a "Designation Counterparty"), and its counsel, if known, of the Debtors' intent to assume and assign or reject such Designated Contract, which notice shall include, among other things, a deadline (the "Objection Deadline") of no less than ten (10) Business Days from the date of service of such notice to object to the assumption and assignment of such Designated Contract.  Upon the expiration of this Objection Deadline, no further Court approval shall be required for the transfer of such Contract or Leases in accordance with the terms of the Stalking Horse Purchase Agreement unless (1) the counterparty to the Designated Contract timely serves an objection upon the Debtors and the Buyer that relates to adequate assurance of future performance or a cure issue that could not have been raised in an objection to any Cure Notice prior to the Sale Hearing and pertains to matters arising after the Closing; *provided, however*, that the rights of the parties set forth on **Exhibit ~~E~~G** attached hereto are fully reserved relating to section 365 of the Bankruptcy Code including assumption, assumption and assignment, adequate assurance of future performance, and the cure of defaults, and such objections are hereby adjourned until a hearing on the assumption of their Assumed Contract or Designated Contract, unless otherwise resolved by the Buyers, the Debtors, and such objecting parties (the "Adjourned Objections"), or (2) the Designation Counterparty otherwise consents to the assumption and assignment on terms mutually agreed by the Buyer and the Designation Counterparty.  To the extent a Designation Counterparty timely files an objection with respect to the assumption and assignment or rejection of such Designated Contract, the Debtors shall be authorized to settle or resolve such objection pursuant to the terms of the Stalking Horse Purchase Agreement and this Sale Order without further order from this Court; *provided, however*, that if the Debtors, Buyer, and objecting Designation Counterparty are unable

to resolve such objection, the Debtors shall schedule the matter for hearing on no less than five (5) Business Days' notice.

24.    23. No finding of fact or conclusion of law set forth in this Sale Order concerning the assumption and assignment of any executory contract or real property Lease that is the subject of an Adjourned Objection shall apply, be binding upon, be law of the case, or operate to collaterally estop any argument by the parties set forth on **Exhibit G** solely in connection with the resolution of an Adjourned Objection, unless agreed to by the counterparty to such executory contract or real property Lease or otherwise ordered by the Court after a hearing on the Adjourned Objection. Any executory contract or real property Lease subject to an Adjourned Objection, shall not be assigned to the Buyer or a designee of the Buyer, as applicable, until such Adjourned Objection is resolved or adjudicated.

25.    24. During the Designation Rights Period, the Buyer may deliver a written notice to the Debtors of Buyer's entry into an agreement with a Designation Counterparty pursuant to which such Designation Counterparty consents to the assumption and assignment to Buyer or its designee of such Designated Contract on the terms set forth in such agreement (each, an "Amended Designated Contract").    The assumption and assignment of such Amended Designated Contract shall be effective on the date set forth in the written notice provided to the Debtors without further order of the Court, unless (a) the counterparty, the Debtors, and the Buyer agree or (b) the Court adjudicates otherwise. During the Designation Rights Period, adequate insurance must remain in place with respect to the Debtors' operations in accordance with the Bankruptcy Code.

26.    25. Pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Sellers of the Assumed Contracts shall not be a default thereunder.    After the payment of the

relevant Cure Amounts as required by the Stalking Horse Purchase Agreement and this Sale Order, the Sellers shall not have any further liabilities to the Contract Counterparties, and the counterparties shall be estopped from asserting any and all Claims or Liens, whether known or unknown, against the Sellers on account of the Assumed Contract.

27. 26. Any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract to the Buyer or allows the party to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment of such Assumed Contract to the Buyer, constitute anti-assignment provisions that are unenforceable and will have no force and effect solely with respect to assumption and assignment pursuant to this Sale Order or any subsequent assumption and assignment order.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Sellers and assignment to the Buyer of the Assumed Contracts have been satisfied.

28. 27. Upon the applicable Assumption Effective Date of any Assumed Contract, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all right, title and interest of the Sellers under such Assumed Contract. To the extent provided in the Stalking Horse Purchase Agreement, the Debtors shall cooperate with and take all actions reasonably requested by the Buyer to effectuate the foregoing.

29. 28. Upon the applicable Assumption Effective Date and the payment of the relevant Cure Amount, if any, the Buyer shall be deemed to be substituted for the Sellers as a party to the applicable Assumed Contract and the Sellers shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under such Assumed Contract.

30.    29. Upon the applicable Assumption Effective Date and the payment of the relevant Cure Amount, if any, the Assumed Contracts will remain in full force and effect (subject to any amendments agreed to between the counterparty to such Assumed Contract and the Buyer), and no default shall exist under the Assumed Contracts and no counterparty to any Assumed Contract shall be permitted (i) to declare a default by the Buyer under such Assumed Contract, or (ii) to otherwise take action against the Buyer as a result of any Debtors' financial condition, bankruptcy, or failure to perform any of its obligations under the relevant Assumed Contract.  Each non-Debtor party to any Assumed Contract hereby is also forever barred, estopped, and permanently enjoined from (a) asserting against the Debtors or the Buyer, or the property of any of them, any default or Claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the applicable Assumption Effective Date, or, against the Buyer, any counterclaim, defense, setoff, or any other Claim asserted or assertable against the Debtors, expect as otherwise provided in this Sale Order, and (b) imposing or charging against the Buyer or its affiliates any rent accelerations, assignment fees, increases (including advertising rates), or any other fees as a result of the Debtors' assumption and assignments to the Buyer of the Assumed Contracts.

31.    30. Nothing in this Sale Order or the Stalking Horse Purchase Agreement shall affect or modify the Debtors' obligations pursuant to section 365(d)(3) of the Bankruptcy Code.

32.    31. For the avoidance of doubt and notwithstanding anything to the contrary contained herein or in the Stalking Horse Purchase Agreement, the Buyer shall be liable for all obligations and liabilities under the Assumed Contracts that are leases of non-residential real property, as may be modified by agreement of the Buyer and the counterparty to such Assumed Contract, to the extent such obligations or liabilities arise or are (as required by the applicable

lease) billed after the Closing Date or the Assumption Effective Date, as applicable, including, but not limited to any and all liabilities or obligations arising under the leases with respect to any accruing and not yet due adjustments or reconciliations (including, without limitation, for royalties, percentage rent, utilities, taxes, common area or other maintenance charges, promotional funds, insurance, fees, or other charges) when billed in the ordinary course, regardless of whether such obligations or liabilities are attributable to the period prior to the Closing Date or the Assumption Effective Date, as applicable, unless otherwise agreed to in writing by the Buyer and the counterparty to such Assumed Contract, in each case subject to the terms and conditions of the lease, as may be modified by agreement of the Buyer and the counterparty to such Assumed Contract.

33. 32. Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, other than the right to payment of any Cure Amount, all Contract Counterparties are forever barred and permanently enjoined from raising or asserting against either the Sellers or the Buyer any assignment fee, default, breach, Claim, pecuniary loss, or condition to assignment arising under or related to the Assumed Contracts (other than those subject to Adjourned Objections) existing as of the Closing Date or arising by reason of the Closing.

34. 33. Notwithstanding that as of the Assumption Effective Date, as provided for by this Sale Order and the Stalking Horse Purchase Agreement, the Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assigned Contracts, any counterparty to an Assumed Contract may seek to recover from the Debtors indemnification obligations, if any, arising from third-party claims asserted with respect to or arising from the Debtors' use and occupancy of Leased Real Property prior to the Assumption

Effective Date for which the Debtors have a duty to indemnify such Lease counterparty pursuant to any Lease, solely with respect to available insurance coverage.

35.    34. Any Contract Counterparty who did not timely file an objection to the assumption of its Assumed Contract shall be deemed to have consented to the Assumed Contract's assumption and assignment to the Buyer pursuant to section 365 of the Bankruptcy Code. Other than the Adjourned Objections, all objections to the assumption and assignment of the Assumed Contracts that have not been withdrawn, waived, settled, or adjourned, as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included in such objections or otherwise, are hereby denied and overruled on the merits with prejudice.

36.    35. All non-Debtor counterparties to the Assumed Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable request of the Buyer, any instruments, applications, consents, or other documents that may be required or requested by any public authority or other party or entity to effectuate the applicable transfers in connection with the sale of the Acquired Assets.

**Other Provisions**

37.    The Committee Objection Resolution shall become effective after the expiration of the Challenge Expiration Notice Period and the Member Notice Period if no objections are received or if the DIP Lenders otherwise agree.

38.    The *Preliminary Objection of Jason Blank, Individually and on Behalf of Similarly Situated Class Members, to the Sale Motion* [Docket No. 513] and the *Objection of Jason Blank, Individually and on Behalf of Similarly Situated Class Members, to the Sale Motion, Declaration of Brian Gleason in Support of Sale Motion, the Debtors' Omnibus Reply in*

*Support of Sale Motion, and BCG Lender Rep, LLC's Omnibus Response in Support of Sale Motion* [Docket No. 531], were withdrawn on the record at the Sale Hearing.  Notwithstanding anything to the contrary in this Sale Order or in the Stalking Horse Asset Purchase Agreement, (i) Assumed Liabilities shall not include any Liabilities relating to Jason Blank, any customer account, customer purchases, membership or personal training agreement, or other Contract, if any, with Jason Blank, and any Customer Credits of Jason Blank, all of which shall be Excluded Liabilities and (ii) Acquired Assets shall not include any customer account, customer purchases, membership or personal training agreement, or other Contract, if any, with Jason Blank, all of which shall be Excluded Assets.

39.    36. With respect to the Debtors' assets located in the jurisdictions set forth below (collectively, the "Tax Authorities"), to the extent an Acquired Asset, the property shall be conveyed subject to existing senior liens for unpaid ad valorem taxes of the respective Tax Authorities for the 2020 calendar year in the maximum principal amounts set forth below for each Tax Authority, which liens shall be Permitted Liens and to the extent a Liability, such Liabilities shall not be Excluded Liabilities, in each case subject to the resolution of any objections (as discussed below), as follows:

- Maricopa County, in a principal amount not to exceed $ 29,574.98;
- Denton County, in a principal amount not to exceed $1,068.84;
- Broward County, in a principal amount not to exceed $ 105,312.63;
- Harris County, in a principal amount not to exceed $13,395.98;
- Dallas County, in a principal amount not to exceed $ 23,188.56;
- Lewisville ISD, in a principal amount not to exceed $ 6,400.62; and
- Tarrant County, in a principal amount not to exceed $ 5,579.54.

Further, should the property subject to the tax liens be conveyed as an Acquired Asset to the Purchaser on or after January 1, 2021, such property shall be conveyed subject to existing senior liens for unpaid ad valorem taxes of the respective Tax Authorities for the 2021 calendar

year which liens shall also be Permitted Liens and, to the extent Liabilities, such taxes shall not

be Excluded Liabilities, in each case subject to the resolution of any objections (as discussed

below).  The foregoing 2020 tax amounts do not constitute an allowance of the claims of the Tax

Authorities or of the amounts such Tax Authorities may be entitled to receive. The claims and

liens of any Tax Authority shall remain subject to any objections made by any party (including

the Debtors and the Buyer) who would otherwise be entitled to raise any objection as to, among

other things, the claim amount or the priority, validity, or extent of such liens.  Further, in the

event such taxes are not paid timely pursuant to applicable non-bankruptcy law, the Tax

Authorities may proceed to collect all amounts owed pursuant to their state law remedies,

without further order or recourse to this Court, subject to the respective rights and defenses of the

Debtors and Buyer.

40.    37. The Change in Control Severance Agreement dated as of September 30, 2019,

by and between Debtor YouFit Health Clubs, LLC and Christy Berks-Stross (the "Severance

Agreement") shall be a Designated Contract as of the Closing Date.  The Buyer shall have the

right to designate the Severance Agreement, and Christy Berks-Stross shall have the right to

oppose the same, in accordance with the terms of the Stalking Horse Purchase Agreement and

Paragraph 2223 of this Sale Order.  All rights, claims, defenses, and arguments of the Debtors,

the Buyer, or Christy Berks-Stross with respect to the assumption, assignment, or rejection of the

Severance Agreement, are expressly reserved.

41.    38. The Debtors' rights (the "Rights"), if any, under (i) thePursuant to the

Court's ruling at the Sale Hearing, (a) that certain Preferred Unit Purchase Agreement, dated as

of April 8, 2014, by and among, among others, Debtor YouFit Health Clubs, LLC, Rick Berks,

Christy Berks-Stross, and Jason Stross and, (iib) thethat certain Profits Interest Unit

~~Agreements~~Agreement, dated December 31, 2014, ~~and~~by and between Debtor YouFit Health Clubs, LLC and Christy Berks-Stross, and (c) that certain Profits Interest Unit Agreement, dated August 10, 2016, by and between Debtor YouFit Health Clubs, LLC and Christy Berks-Stross ~~are Acquired Assets that shall~~(collectively, (a), (b) and (c), the "Berks-Stross Agreements") are hereby deemed to be included in the list of assets defined as "Excluded Assets" in the Stalking Horse Purchase Agreement and Section 2.1(q) of the Stalking Horse Purchase Agreement is hereby deleted and replaced with "Reserved."  For the avoidance of doubt, the Berks-Stross Agreements shall not be transferred to the Buyer ~~upon the Closing in accordance~~in connection with the ~~Stalking Horse Purchase Agreement and this Sale Order.  To the extent the Buyer seeks to enforce the Rights against Rick Berks, Christy Berks-Stross, or Jason Stross (collectively, the "Berks/Stross Parties"), all rights, claims, defenses, and arguments of the Debtors, the Buyer, or each of the Berks/Stross Parties, including, but not limited to, rights, claim, defenses, and arguments related to the scope or enforceability of the Rights, are expressly reserved~~Sale.

42.    ~~39.~~Any Prepetition Liabilities or DIP Obligations not included in the Credit Bid Consideration and not assumed by the Buyer as specified in Paragraph P of this Sale Order shall remain outstanding against the relevant Debtors until such Prepetition Liabilities are indefeasibly repaid in full in cash or other otherwise satisfied in a manner acceptable to the Prepetition Lenders.

43.    ~~40.~~If and to the extent the Debtors' Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code, any cash or cash collateral held by the Debtors for which no potential expense exists under the Approved DIP Budget shall be remitted to the Buyer prior to such conversion.

44. 41. Absent the express written consent of the Buyer, the Debtors shall not settle or otherwise resolve any Litigation with any third party or any Governmental Entity other than any settlement pursuant to which (i) any Liability thereunder will be an Excluded Liability, (ii) no payment from the Buyer is sought or required, and (iii) no restrictions are placed on or affecting the Business or Acquired Assets from and after the Closing Date.

45. 42. The consideration provided by the Buyer for the Sellers' rights, title, and interest in the Acquired Assets under the Stalking Horse Purchase Agreement constitutes reasonably equivalent value and fair consideration for the Acquired Assets under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and other applicable law within the meaning of section 544(b) of the Bankruptcy Code, under the laws of the United States, any state, territory, possession, or the District of Columbia.

46. 43. Effective upon the Closing Date, except as set forth in the Stalking Horse Purchase Agreement with respect to Assumed Liabilities and Permitted Liens, all persons and entities are forever prohibited and permanently enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Buyer, its successors and assigns, or the Acquired Assets, with respect to any (i) Claims and Liens arising under, out of, in connection with or in any way relating to the Sellers, the Buyer, the Acquired Assets, or the operation of the Acquired Assets prior to the Closing or (ii) successor liability based, in whole or in part, directly or indirectly, on any theory of successor or vicarious liability of any kind of character, or based upon any theory of antitrust, environmental, successor or transferee liability, *de facto* merger or substantial continuity, labor and employment, or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, or

liquidated or unliquidated, including, without limitation, the following actions: (a) commencing or continuing in any manner any action or other proceeding against the Buyer, its successors or assigns, assets, or properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against the Buyer, its successors or assigns, assets, or properties; (c) creating, perfecting, or enforcing any Claims or Liens against the Buyer, its successors or assigns, assets, or properties; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to the Buyer or its successors or assigns; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or refusing to renew any license, permit or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with the Acquired Assets; *provided, however*, that any right of setoff or recoupment of counterparties that filed Adjourned Objections is preserved to the extent such rights exist under applicable law, but subject to the rights of the Debtors, the Buyer, and any of their affiliates and successors to contest any such rights of setoff and/or recoupment.

47.    44. Except for the Assumed Liabilities and Permitted Liens, the Buyer shall not have any liability or other obligation of the Debtors arising under or related to any of the Acquired Assets or the Stalking Horse Purchase Agreement or the transactions related thereto. Without limiting the generality of the foregoing, and except for the Assumed Liabilities or Permitted Liens provided in the Stalking Horse Purchase Agreement, the Buyer shall not be liable for any Claims or Liens against the DebtorsSellers or any of itstheir predecessors or affiliates, and the Buyer shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee

liability, labor law, *de facto* merger or substantial continuity, labor and employment, or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, or liquidated or unliquidated, with respect to the ~~Debtors~~Sellers or any obligations of the ~~Debtors~~Sellers arising before the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Acquired Assets before the Closing.

48.    ~~45.~~ The transactions contemplated by the Stalking Horse Purchase Agreement are undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Assumed Contracts), unless such authorization and such Sale are duly stayed pending such appeal.  The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

49.    ~~46.~~ No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the transactions with the Debtors that are approved by this Sale Order, including, without limitation, the Stalking Horse Purchase Agreement and the Sale.

50.    ~~47.~~ The failure specifically to include any particular provision of the Stalking Horse Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Stalking Horse Purchase Agreement be authorized and approved in its entirety.

**Amendment to Stalking Horse Purchase Agreement**

51.    Section 2.7 of the Stalking Horse Purchase Agreement shall be amended to also provide the following:

>      The Buyer shall have the option to delay the purchase of any Acquired Assets hereunder (the "Delayed Acquired Assets") to one or more days following the Closing Date at the Buyer's expense as set forth in any Transition Services Agreement.  The Buyer shall notify the Sellers of any Delayed Acquired Assets by written notice given prior to the Closing Date.  In the ninety (90) day period following the Closing Date, the Buyer shall have the option to designate any Delayed Acquired Asset as an Acquired Asset by providing notice of such designation to the Sellers.  At such time, the Delayed Acquired Asset shall be deemed an Acquired Asset for all purposes herein and under the Sale Order; provided that no additional consideration shall be due for any Delayed Acquired Assets.  The Sellers and the Buyer shall execute, acknowledge, and deliver such other instruments and take commercially reasonable efforts as are reasonably practicable to implement the foregoing.

52.    48.    The Stalking Horse Purchase Agreement and any related or ancillary agreements, documents or other instruments may be further modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court; *provided* that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.  The Stalking Horse Purchase Agreement shall not be altered, amended, rejected, discharged, or otherwise affected without the prior written consent of the Buyer.

53.    49.    To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in the Chapter 11 Cases, the terms of this Sale Order shall govern.  To the extent there are any inconsistencies between the terms of this Sale Order and the Stalking Horse Purchase Agreement (including any ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

54.    50.    The provisions of this Sale Order are nonseverable and mutually dependent.

55. 51. All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

56. 52. The transactions authorized herein shall be of full force and effect, regardless of any Debtors' lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

57. 53. From time to time, as and when requested, all parties shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as the requesting party may reasonably deem necessary or desirable to consummate the Sale, including such actions as may be necessary to vest, perfect, or confirm or record or otherwise in the Buyer its right, title, and interest in and to the Acquired Assets.

58. 54. Subject to the Debtors' performance under the terms of any Transition Services Agreement, neither the Debtors nor any of their affiliates shall use, license, or permit any third party to use any name, slogan, logo, or trademark which is similar to any of the names, trademarks, or service marks included in the Intellectual Property in the Acquired Assets, and the Sellers are directed to change its corporate name to a name which (i) does not use the name "YouFit" or any other name that references or reflects any of the foregoing in any manner whatsoever, (ii) is otherwise substantially dissimilar to its present name, and (iii) is approved in writing by the Buyer. Within a reasonable time after the Closing Date, the Debtors shall file a separate motion consistent with Local Rule 9004-1(c) seeking to modify the case caption to reflect the Sellers' new corporate name and serve the same in accordance with Local Rule 9006-1.

59. 55. The Debtors are authorized to take all actions necessary to effect the relief granted pursuant to this Sale Order in accordance with the Motion.

60. 56. The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified, lifted, and annulled with respect to the Debtors and the Buyer to the extent necessary, without further order of this Court, to (i) allow the Buyer to deliver any notice provided for in the Stalking Horse Purchase Agreement, and (ii) allow the Buyer to take any and all actions permitted under the Stalking Horse Purchase Agreement or any other Sale-related document in accordance with the terms and conditions thereof.  The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Stalking Horse Purchase Agreement or any other Sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence.  The portion of the DIP Obligations and the Prepetition Liabilities in excess of the Credit Bid Claim and those assumed as part of the Purchase Price shall remain outstanding against the applicable Debtors and any of their assets not purchased by the Buyer until such Prepetition Liabilities are indefeasibly repaid in full in cash or other otherwise satisfied in a manner acceptable to the Prepetition Lenders, and the Prepetition Agent and the Prepetition Lenders shall continue to be protected by and entitled to the benefit of the terms and provisions of the Prepetition Credit Documents and DIP Credit Documents (as defined in the Final DIP Order) and other orders entered by this Court in respect thereof.

61. 57. Notwithstanding the provisions of Bankruptcy Rule 6004(h) and Bankruptcy Rule 6006(d), and pursuant to Bankruptcy Rules 7062(g) and 9014, this Sale Order shall not be stayed, shall be effective immediately upon entry, and the Debtors and the Buyer are authorized to close the Sale immediately upon entry of this Sale Order.  Time is of the essence in closing the

transactions referenced herein, and the Debtors and the Buyer intend to close the Sale as soon as practicable.

62.    58.    This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Stalking Horse Purchase Agreement, all amendments thereto as well as any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party and adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

**Exhibit A**

**Stalking Horse Purchase Agreement**

**Exhibit A–1**

**Asset Purchase Agreement**
**November 10, 2020**

AmericasActive:15211476.19

**Exhibit A–2**

**First Amendment to Asset Purchase Agreement**
**December 4, 2020**

## Exhibit B

### Assumed Contracts

None.

**Exhibit C**

**Challenge Expiration Notice**

**Exhibit D**

**Member Notice**

**Exhibit E**

**Committee Avoidance Actions**

1. Any Avoidance Actions against West Central Construction in the aggregate amount of $12,500,000 for amounts received in the four years prior to the Petition Date.

**Exhibit ~~D~~E**

**Notice of Designated Contracts**

**Exhibit ~~D~~F–1**

**Exhibit ~~D~~F–2**

## Exhibit ~~F~~G

**Adjourned Objections**

Document comparison by Workshare 9.5 on Sunday, December 27, 2020
9:52:22 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://DMS-AMERICAS/ACTIVE/54439676/1 |
| Description | #54439676v1<ACTIVE> - YouFit - (For Filing) Proposed Sale Order (12.27.20) |
| Document 2 ID | interwovenSite://DMS-AMERICAS/ACTIVE/54439676/2 |
| Description | #54439676v2<ACTIVE> - YouFit - (For Filing) Proposed Sale Order (12.27.20) |
| Rendering set | GT-1 |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 124 |
| Deletions | 96 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 220 |